# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs June 5, 2007

## STATE OF TENNESSEE v. TOMMY ROSCOE

**Direct Appeal from the Criminal Court for Shelby County**
**No. 05-01808     Chris B. Craft, Judge**

---

**No. W2006-01605-CCA-R3-CD  - Filed July 11, 2007**

---

The defendant, Tommy Roscoe, was convicted of robbery, a Class C felony, and sentenced as a Range III, persistent offender to twelve years in the Department of Correction.  He raises two issues on appeal: (1) whether a pretrial photographic identification procedure was impermissibly suggestive; and (2) the sufficiency of the evidence.  Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and J.C. MCLIN, JJ., joined.

James M. Gulley and Deena Knopf, Memphis, Tennessee, for the appellant, Tommy Roscoe.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; William L. Gibbons, District Attorney General; and Michelle Parks, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

Testifying through an interpreter, the victim, Mario Mejia, said that on October 3, 2004, he went to visit a friend at an apartment complex located at 1400 Court Avenue in Memphis.  After he got out of his green pickup truck, he was approached by two African-American men.  One of the men grabbed him by the neck and shirt, pushed him against a wall, and took his wallet containing $70 to $80 and his keys.  The two men then sped off in Mejia's truck.  Mejia said that he paid $3,900 for the truck and had owned it for "six to seven months."  The police later recovered Mejia's truck, and it was returned to him undamaged the night after the robbery, but a hydraulic jack was missing.  Mejia gave a statement at the police station and viewed a photographic lineup but was unable to

make an identification. The police subsequently brought another photographic lineup to his apartment, and he was able to identify the defendant as the man who "grabbed" him by the neck and robbed him of his truck.

Mejia said that, when his attacker grabbed him by the neck, they were face-to-face and that he recognized the photograph of the defendant as someone he previously had seen in his neighborhood. Mejia was unable to make a courtroom identification of the defendant. However, at a court proceeding on December 2, 2004, Mejia identified a different man as the perpetrator.

Also testifying through an interpreter, Mario Ortiz said that on October 4, 2004, his roommate awakened him at about 10:00 p.m. and told him that "he found an American who was selling [a] truck." Ortiz met with the seller whom he described as a short, white man about "40 years old or older." The truck was a green 1995 Nissan, and Ortiz thought it was stolen because "the American" was selling it for a very low price and did not have a title of ownership. Ortiz wrote down the vehicle identification number and gave it to a friend who contacted the police. The police subsequently arrested the seller.

Stephen Thornton testified that he was arrested while trying to sell the victim's truck to Ortiz and charged with theft of property over $1000 as a result. Thornton said that he got the truck from the defendant the night he was arrested and identified the defendant in the courtroom. Thornton explained that he had been "panhandling" in a Kroger parking lot when the defendant "pulled up" and asked him if he wanted "to make some money" by selling the truck. The defendant told him that he had gotten the truck "from somebody off of Court Street." Thornton and the defendant then drove the truck to the Macon Manor Apartments on Macon Road. As Thornton talked to Ortiz and tried to negotiate a price for the sale of the truck, the defendant waited nearby. After agreeing to take $800 for the truck, Thornton wrote out a "bill of sale" stating "I, Stephen Thornton, sell my truck to Mario Ortiz," and copied the vehicle identification number onto the document. However, before he gave the "bill of sale" to Ortiz, "something didn't feel right," so he decided "not to do it." As Thornton walked away, he was apprehended by the police.

Officer Joseph Johnson of the Memphis Police Department testified that he arrested Thornton at the apartment complex and that Thornton said he had gotten the truck from "a male black."

Sergeant Robert Scoggins of the Memphis Police Department Robbery Bureau testified that he was the investigator in charge of the robbery. On October 5, 2004, he took a statement from the victim and showed him a photographic lineup from which no identification was made. Sergeant Scoggins also took Thornton's statement the day after he was arrested for attempting to sell the victim's truck to Ortiz. Thornton told him that he got the truck from a man named "Roscoe" near the intersection of Poplar and Cleveland. Scoggins prepared a photographic lineup for Thornton who identified the defendant as the man from whom he had received the truck. Subsequently, on October 11, 2004, Sergeant Scoggins showed the same photographic lineup to the victim who also identified the defendant.

Officer Roosevelt Coleman, a communications supervisor for the Memphis Police Department, testified for the defense that an event chronology document is created when citizens call the police department and speak with dispatchers. Officer Coleman confirmed that an event chronology was created twenty minutes after midnight on October 3, 2004, regarding an automobile theft at 1400 Court Avenue.

The defendant did not testify, and the jury convicted him as charged.

## ANALYSIS

### I. Constitutionality of Photographic Lineup

On appeal, the defendant argues that the pretrial photographic identification procedure used by Sergeant Scoggins with the victim violated his constitutional rights. He contends that:

> The pretrial photographic identification procedure was so impermissibly or unnecessarily suggestive as to give rise to a very substantial likelihood of irreparable misidentification of [d]efendant as the perpetrator of the robbery in violation of the Due Process clauses of the Fourteenth Amendment of the United States Constitution and Article I, Section 8 of the Tennessee Constitution.

Specifically, the defendant claims that the photographic lineup shown to the victim at his apartment by Sergeant Scoggins on October 11, 2004, was impermissibly suggestive because it contained "a fatal defect as [d]efendant's photograph is the only picture of a black male with a noticeable lazy eye and scar on his face." Moreover, the defendant asserts that Sergeant Scoggins "severely heightened the suggestiveness of the identification procedure by alluding to the fact that the suspect was pictured in the photographic array." As such, he argues that "the testimony and evidence pertaining to the pretrial photographic identification itself should not have been admitted into evidence at trial and the judgement should be reversed."

The trial court held a pretrial suppression hearing where Sergeant Scoggins testified that the victim gave a description of the robbers prior to viewing the photographic lineup. The victim described the first robber as an African-American male between thirty and thirty-five years old, approximately five feet, eleven inches tall, and weighing 160 pounds, with dark skin, a goatee, and "short, natural hair." The victim described the second robber as an African-American male about twenty-seven years old and the same height and weight as the first robber. The victim did not mention a "lazy eye" or any facial scar in his descriptions.

Based on that information and the statement Thornton provided after his arrest, Sergeant Scoggins used a computer program to create the spread of photographs. He told the victim prior to the viewing that he "had a photographic lineup of possible suspects that he could choose from" but did not assist him in any way in making an identification. He instructed the victim that "there were six pictures in [the] photographic lineup so he was to look at [it] and if he saw the person

responsible, that he was to make an identification. If not, he was not to make an identification." The victim did not hesitate in identifying the defendant from the lineup.

The trial court concluded that neither the photographic lineup itself nor the identification procedure was constitutionally infirm:

> Well, looking at Exhibit A, which is the photograph, I don't see a scar and I really don't see a lazy eye. I'm looking at [the defendant's photograph], which is circled. I can't see a scar. I'm looking at the eyes. The only thing I see different in the eyes is one of the eyes there's a little white dot in one pupil, as a light reflection, and there's not a dot in the other eye.

> Looking at picture six, that person is the same – his eyes are the same way. In the other four photographs, they either both eyes have little white dots or they don't have little white dots, but I just don't see – looking at this picture if you'd asked me to describe this person, I wouldn't have described a scar. I would not have described one eye being smaller than the other eye. It just doesn't appear that way.

> In looking at the defendant in court, I don't see from here I don't see a scar or a lazy eye. He may have one but I don't see one. They're not distinctive.

> As far as telling people they're possible suspects, I just – I think that everyone who looks at a photo spread would know that, otherwise the police are just spinning their wheels. They shouldn't say we've caught someone who is in here, see if you can identify him. That would be wrong. But saying there are possible suspects and making it plural, I think is not suggestive. It doesn't suggest which of the six, and it doesn't make someone pick someone out because they use the word "possible."

> . . . .

> I don't see that this photo spread is unfair at all. Now whether or not – I mean, [defense counsel] is free to argue that to the jury and whether or not the victim in this case identified the defendant in the courtroom or not is one thing. But as far as these pictures, it just seems to me to be a fair photo spread and it's not suggestive. If you were to show this to me and say pick out the robber, I wouldn't be able to pick any particular person because they all have different characteristics. . . .

> If you look at picture number five, you could argue that there's some kind of scar on his face because he has kind of a scarred face. Number six, there's a scar – appears to be a slight scar over his left eye. I don't know where the scar is on the defendant's picture other than there seems to be an extra dimple on his left cheek, but there are dimples on the left cheek of number five and also number one.

So, for that reason I'm going to find that it's not so suggestive. Looking at case law at our Simmons versus United States 1968 case, . . . convictions based on eyewitness identification at trial following a pretrial photographic identification will be set aside only if the photographic identification was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. And I can't see that in this case. . . .

On appeal, a trial court's findings of fact regarding a motion to suppress are conclusive unless the evidence preponderates against them. State v. Reid, 213 S.W.3d 792, 825 (Tenn. 2006) (citing State v. Ross, 49 S.W.3d 833, 839 (Tenn. 2001)). Any question about the "credibility of witnesses, the weight and value of the evidence, and a resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Unless the defendant demonstrates that "the evidence preponderates against the judgment of the trial court, this court must defer to the ruling of the trial court." Reid, 213 S.W.3d at 825 (citing State v. Cribbs, 967 S.W.2d 773, 795 (Tenn. 1998)). However, "application of the law to the facts as determined by the trial court is a question of law which is reviewed *de novo* on appeal." State v. Darrell Toomes, No. W2004-01739-CCA-R3-CD, 2005 WL 1541687, at *6 (Tenn. Crim. App. June 27, 2005) (citing State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997)).

As our supreme court has previously ruled, the "[p]hotographs contained in a photographic array do not have to mirror the accused. Instead, the law simply requires that the police refrain from 'suggestive identification procedures.'" State v. Hall, 976 S.W.2d 121, 153 (Tenn. 1998) (quoting Neil v. Biggers, 409 U.S. 188, 93 S. Ct. 375 (1972)). Accordingly, a photographic identification only becomes inadmissible, if, "based upon the totality of the circumstances, 'the confrontation conducted . . . was so unnecessarily suggestive and conducive to irreparable mistaken identification that [the accused] was denied due process of law.'" Darrell Toomes, 2005 WL 1541687, at *6 (quoting Stovall v. Denno, 388 U.S. 293, 301-302, 87 S. Ct. 1967, 1972 (1967)). The risk of irreparable mistaken identification is heightened if one of the photographs in the photographic lineup "is in some way emphasized," or if "the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime." Simmons v. United States, 390 U.S. 377, 383, 88 S. Ct. 967, 971 (1968).

Based upon our review of the record on appeal, including the photographic array from which the victim's identification of the defendant was made, we conclude that the evidence supports the determination of the trial court that neither the lineup itself nor the procedure by which it was viewed was impermissibly suggestive. Moreover, the fact that the victim made no mention of a "lazy eye" or facial scar in his somewhat detailed description of the defendant before viewing the photographic lineup further supports the trial court's denial of the motion to suppress. This issue is therefore without merit.

-5-

## II. Sufficiency of the Evidence

Additionally, the defendant argues that the evidence is insufficient to support his robbery conviction. He contends that because the victim was not able to identify him from a photographic lineup or "face-to-face" in the courtroom, the evidence linking him to the actual robbery is insufficient. As for Thornton's testimony, the defendant asserts that even if it is taken "as one hundred percent (100%) true, the evidence is still insufficient to allow a rational trier of fact to find [d]efendant guilty of robbery." According to the defendant, Thornton's testimony that the defendant said he got the truck "from somebody off of Court Street" is not sufficient to establish his involvement in the robbery. The defendant points to the lack of corroborating physical evidence to support his argument and claims that "if the jury inferred that because [d]efendant was in possession of the truck the next day that he robbed [the victim] the night before, that the above inference was not reasonable in light of the fact that there was extremely poor identification evidence connecting [d]efendant to the robbery."

In consideration of this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). This rule applies when the determination of guilt is based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing State v. Dykes, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966) (citing Carroll v. State, 370 S.W.2d 523 (Tenn. 1963)). Additionally, a jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Robbery is defined by statute as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a) (2006). Viewed in a light most favorable to the prosecution, the evidence presented in this case is sufficient to support the defendant's conviction. Although the victim was unable to make a courtroom identification of the defendant, he did identify him as the robber from a photographic lineup eight days after the robbery, and the discrepancy could reasonably be attributed to the passage of time. In addition, the victim's identification, when coupled with Thornton's testimony that he received the truck from the defendant, who claimed he obtained it on the same street where the crime was committed, supports the reasonable inference that the defendant was one of the men who robbed the victim. This issue is without merit.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE